# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3031 | **DATE** | 7/9/2004 |
| **CASE TITLE** | Arthur L. Green vs. Pace Suburban Bus | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendant Pace Suburban Bus Motion for Summary Judgment[51-1] is Granted and its Motion to Strike[62-1] is Denied as Moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | JUL 1 2 2004 | | |
| | Notified counsel by telephone. | | date docketed | | 67 |
| ✓ | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | 2004 JUL -9 PM 3:24 | | | |
| TBK | courtroom deputy's initials | FILED EDI | JUL 1 2 2004 date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARTHUR L. GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 02 C 3031 |
| | ) | |
| PACE SUBURBAN BUS, | ) | Hon. Mark Filip |
| | ) | |
| Defendant. | ) | |

DOCKETED

JUL 1 2 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Arthur L. Green ("Plaintiff" or "Green") is suing his former employer,

Defendant Pace Suburban Bus Service ("Defendant" or "Pace"), alleging Pace discriminated

against him because of a disability in violation of the Americans with Disabilities Act ("ADA"),

42 U.S.C. § 12101 *et seq.* This case is before the Court on Defendant's Motion for Summary

Judgment (D.E. 51) and Motion to Strike Portions of Plaintiff's Local Rule 56.1(b) Summary

Judgment Response Memorandum and Statement of Additional Facts (D.E. 62).[1] Defendant's

Motion for Summary Judgment is granted and Defendant's Motion to Strike is denied as moot.

## BACKGROUND

Defendant Pace is Green's former employer, providing, among other things,

transportation services to the public in suburban Chicago. Pace has multiple operating divisions

(Def.'s St. ¶ 2), one of which is the North Shore Division, located in Evanston, Illinois (*id.* ¶ 3).

On February 26, 2001, Pace's North Shore Division hired Green (*id.* ¶ 5) on a probationary basis

as a part-time bus operator to drive a bus and shuttle bus, with the probationary period to last for

---

[1]     The various docket entries in this case are cited as "D.E. __."

six months (*id.* ¶ 63-64; D.E. 58 at 3).[2] As part of the hiring process, Green took (and passed) a pre-employment physical that is based on criteria established by the United States Department of Transportation ("DOT").[3] (Pl.'s St. ¶ 1.)

Pace terminated Green before the expiration of the probationary period (Def.'s St. ¶ 66), after subsequent medical examinations by Green's personal physicians, prompted by Green having sought emergency medical attention (*id.* ¶ 6), resulted in Green being diagnosed with health issues that physically disqualified him from driving a bus under DOT regulations and Pace policy (*id.* ¶¶ 13-18, 51-53). The health issues diagnosed by Green's doctors included congestive heart failure and something called idiopathic dilated cardiomyopathy or "IDC." (*Id.* ¶¶ 6,8.) Green thereafter filed a *pro se* lawsuit, and he has been ably represented thereafter by his court appointed counsel, who appear *pro bono*.

As explained, Pace follows the DOT certification regulations as a matter of corporate policy. (*Id.* ¶ 13.) The DOT has established medical standards to determine whether a person is physically qualified to drive a commercial motor vehicle. (*Id.* ¶ 14.) Specifically, the DOT regulations state that a person shall not drive a commercial motor vehicle unless he or she is physically qualified to do so and has a medical examiner's approval evidencing that qualification. (*Id.* ¶ 15.) The DOT regulations define a physically qualified driver as a person who has, among

---

[2] Green's Brief in Opposition to Summary Judgment is cited to by its docket entry number, D.E. 58.

[3] The following facts are taken from the parties' Local Rule (hereinafter "LR") 56.1 Statements and Responses, as well as other admissible evidence in the record. Where facts are in dispute, the Court describes the version of the facts most favorable to Green. This opinion cites to Pace's LR 56.1(a)(3) statement as "Def.'s St. ¶ __" and to Green's LR 56.1(b)(3)(B) statement as "Pl.'s St. ¶ __."

various other things, "no current clinical diagnosis of . . . cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure." (*Id.* ¶ 16.) All North Shore Pace employees are required to have DOT medical certification to physically qualify to drive a bus. (*Id.* ¶ 76.) The parties agree that a Pace bus driver's physical qualification under the DOT regulations, as determined by a physician, is an essential function of a bus driver's job. (*Id.* ¶ 23.) It is also undisputed that Pace has no discretion to allow an employee who has not received DOT medical certification to drive a bus. (*Id.* ¶ 24.)

Green's personal physicians diagnosed him with IDC after a series of hospital visits in the spring/summer of 2001. Specifically, on May 31, 2001, Green sought medical care at St. Francis Hospital in Chicago, where Green was diagnosed with pneumonia. (Pl.'s St. ¶ 4.) On June 4, 2001, Green went to the St. Francis emergency room and was diagnosed with acute pneumonia. (*Id.*) Finally, on June 25, 2001, the staff of Rush University Medical Center hospitalized Green, and Dr. Constantine Katsamakis, an internal medical resident, and Dr. John Barron, the attending cardiologist, treated Green. (Def.'s St. ¶ 6.) At the time, Green suffered from, among other things, lower extremity edema (swelling of the legs), increasing abdominal girth, an enlarged heart, congestive heart failure, and dyspnea (shortness of breath). (*Id.* ¶ 7.) Drs. Barron and Katsamakis diagnosed Green with IDC (*id.* ¶ 8), which is a heart condition that primarily affects the left ventricle and causes the heart to become weak and pump inefficiently (*id.* ¶ 9). The disease carries with it a material risk of sudden death (*id.* ¶ 12) and/or syncope (sudden passing out and collapsing) (*id.* ¶ 11). It is unclear from the record whether Green's pneumonia was related to the IDC.

On June 30, 2001, Rush University Medical Hospital discharged Green (Def.'s St. ¶ 25),

3

and Drs. Katsamakis and Barron thereafter continued to treat him on an out-patient basis (*id.* ¶¶ 27-28). Dr. Barron did not release Green to return to work upon his discharge. (*Id.* ¶ 26.) Green met with Dr. Katsamakis on July 6, 2001, and Dr. Katsamakis instructed Green to refrain from working until he was evaluated by Dr. Barron. (*Id.* ¶ 27.) Dr. Barron examined Green on July 19, 2001, and he determined that Green's congestive heart failure had not resolved. (*Id.* ¶ 28.) Although Dr. Barron wrote a note at that time stating that Green could return to work on a part-time basis, it is undisputed that Dr. Barron testified that he did not intend to release Green back to work as a bus driver. (*Id.* ¶ 29.)[4] Rather, Dr. Barron, Green's own physician, made clear that he intended to release Green back to work in some other capacity that would require less exertion and would alleviate the dangers associated with his condition. (*Id.* ¶ 30.) Indeed, Dr. Barron testified that he assumed that Green would *not* return to work as a bus driver. (*Id.* ¶ 31.) Although Dr. Barron was not familiar with (and did not consult) the DOT regulations at this time (*id.* ¶ 32), Dr. Barron testified that he would not have certified Green to drive a bus on July 19, 2001, had he been aware of the DOT regulations (*id.* ¶ 34).

Michael Cutler ("Cutler") is the Safety Training Manager for Pace's North Shore Division. (*Id.* ¶ 19.) He is responsible for ensuring that Pace complies with its policies and procedures regarding DOT certifications. (*Id.* ¶ 20.) Green gave Dr. Barron's note to Cutler on July 19, 2001. (Pl.'s St. ¶ 8.) However, because Green had missed more than five days of work due to his hospitalization (Def.'s St. ¶ 37), Cutler directed him to Dr. Efren Estrella of St. Francis

---

[4]    Green disputes certain allegations relating to Dr. Barron to the extent that the allegations imply that Pace knew of Dr. Barron's intent at the time Pace terminated Green. The Court has reviewed the material cited by Pace in support of these allegations and the cited facts reflect the deposition testimony of Dr. Barron that is proffered in support of these allegations, which Green does not dispute.

Hospital (*id.* ¶¶ 38-39), in accordance with Pace policy (*id.* ¶ 35). Dr. Estrella has performed physical examinations for employers since 1989 and for Pace since 2000. (*Id.* ¶ 40.) Dr. Estrella is familiar with DOT regulatory criteria for evaluating commercial bus drivers. (*Id.* ¶ 41.) Cutler was Dr. Estrella's contact person at Pace. (Pl.'s St. ¶ 21.) Cutler in turn reported to Green's supervisor, Christopher Fardoux ("Fardoux"), who is responsible for supervising bus drivers and street operations at Pace North Shore; Fardoux's superior, in turn, was William Heelan ("Heelan"). (*Id.* ¶¶ 21-22.) Dr. Estrella did not give Green an independent physical examination (*id.* ¶ 9); instead, he considered a medical certification form signed by one of Mr. Green's personal physicians, Dr. Katsamakis (*id.* ¶ 53).[5]

In this regard, Green saw Dr. Katsamakis on July 27, 2001. Dr. Katsamakis signed a DOT medical certification form stating: (1) that Green was presently under his care for IDC; (2) that he read and was aware of the Regulatory Criteria for Evaluation of drivers under 49 C.F.R. § 391.41; (3) that Green's present medical condition may interfere with Green's ability to drive a bus safely; and (4) that Green needed further treatment before a DOT medical certificate could be issued. (*Id.* ¶ 46.) Dr. Katsamakis also conferred with Dr. Barron, who agreed with Dr. Katsamakis's assessment that Green's conditions may interfere with his ability to drive a bus safely, although the parties disagree over when Drs. Katsamakis and Barron communicated. (*Id.* ¶ 50.) In sum, neither Dr. Katsamakis nor Dr. Barron released Green to return to work as a bus driver (*id.* ¶ 51), and they agreed that Green should have been removed from service under the

---

[5] Green contested Def.'s St. ¶ 53. However, Green failed to comply with LR 56.1(b)(3)(A) in that his response to this paragraph states "Contested," but fails to make specific references to the record to support the contention. Accordingly, the facts in Def.'s St. ¶ 53 are deemed admitted.

DOT criteria/Pace corporate policy concerning driving a bus (*id.* ¶ 52). After considering Dr. Katsamakis's evaluation and the DOT regulations, Dr. Estrella determined that Green should immediately be taken out service for six months. (*Id.* ¶ 53.) Dr. Estrella made this determination due to his concerns with Green's IDC, which is known to cause, among other things, sudden syncope (passing out). (*Id.* ¶ 54.) On July 30, 2001, Dr. Estrella informed Cutler that Green was removed from service for six months. (*Id.* ¶ 62; Pl.'s St. ¶ 18.)

On August 25, 2001 (presumably one day before the expiration of Green's six-month probationary period), Cutler and Fardoux drove to Green's home and left a letter that terminated Green's employment with Pace. (Pl.'s St. ¶ 25.) Two weeks after Pace discharged Green, Green began another full-time job as a janitor. (Def.'s St. ¶ 67.) No restrictions were imposed on Green's janitorial activities. (*Id.* ¶ 70.) The position required Green to perform physical tasks such as mopping, shampooing, and lifting. (*Id.* ¶ 71.) Furthermore, Green was able to walk, run, and lift during this time (*id.* ¶ 69), and he did not consider his daily activities to be restricted (*id.* ¶ 68). Green also did not consider himself to be restricted at the time Pace fired him, and does not contend that he actually was disabled at that time. (*Id.* ¶¶ 68, 74.)

DISCUSSION

I.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate

6

time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *accord, e.g., Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir.1995). In ruling on a summary judgment motion, it is not a court's "function to scour the record in search of evidence to defeat . . . summary judgment; [a court relies] on the nonmoving party to identify with reasonable particularity the evidence upon which [the nonmoving party] relies." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996); *see also, e.g., Richards*, 55 F.3d at 251.

## II.     The ADA

Section 12112(a) of the ADA prohibits, among other things, discrimination "against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees." 42 U.S.C. § 12112(a); *accord Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 502 (7th Cir. 2004). Section 12111(8) defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *accord Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004). Section 12102(2) defines a disability, in relevant part, as either "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; . . . or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *accord, e.g., Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 478 (1999).

7

A.    Green Does Not Contend that He Was Disabled For Purposes Of The ADA And
There Is No Triable Contention That He Was Regarded As Disabled By Pace

Summary judgment in this case is justified for multiple, independent reasons. The first is

that Green does not contend that he actually was disabled within the meaning of the ADA and

there is no triable contention that he was regarded as disabled by relevant Pace decisionmakers.

For Mr. Green's ADA claim to survive summary judgment, he must produce sufficient

evidence to meet his "threshold burden" of establishing that "he is disabled as that term is

defined in the ADA." *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 950 (7th Cir. 2000).

Green has indicated that he does not believe that he was disabled at the time he was terminated

(Def.'s St. ¶ 74); rather, in his Opposition to Defendant's Motion for Summary Judgment, Green

contends that his suit presents a "perceived disability case." (D.E. 58 at 1, 11.) Green has

therefore framed his ADA claim as a "regarded as disabled" claim, one of the recognized types of

ADA claims. *See* 42 U.S.C. § 12102(2)(C); *Sutton*, 527 U.S. at 489.

To fall within § 12102(2)(C), Green must demonstrate that: (1) Pace mistakenly believed

that he had a physical impairment that substantially limits one or more of his major life activities,

or (2) Pace mistakenly believed that an actual, nonlimiting impairment substantially limits one or

more major life activities. *See, e.g., Mack v. Great Dane Trailers*, 308 F.3d 776, 780 (7th Cir.

2002). Green is apparently attempting to proceed under the second prong, arguing, as discussed

below, that Pace believed that Green's heart condition limited him in four major life activities.

(D.E. 58 at 12.) The question for the Court, then, "is whether [Pace] perceived [Green's IDC] to

be sufficiently severe to substantially limit a major life activity." *Skorup v. Modern Door Corp.*,

153 F.3d 512, 515 (7th Cir. 1998). In this regard, Green must show more than that Pace was

8

aware of his IDC. *See, e.g., Skorup*, 153 F.3d at 515. Rather, Mr. Green must show that Pace knew of the IDC, *and* he must produce some evidence, direct or circumstantial, from which a jury could conclude that Pace regarded him as substantially limited in a major life activity because of it. *See Mack*, 308 F.3d at 783; *Skorup*, 153 F.3d at 515.

A major life activity is an activity of "central importance to daily life." *Toyota Motor Mfg., Ky., Inc v. Williams*, 534 U.S. 184, 197 (2002). EEOC regulations interpreting the ADA identify the following non-exhaustive list of major life activities: "'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Skorup*, 153 F.3d at 514 (quoting 29 C.F.R. § 1630.2(i)). "'Substantially limits' means that the person is either unable to perform a major life function, or is significantly restricted in the duration, manner, or condition under which the individual can perform a particular major life activity, as compared to the average person in the general population." *Contreras v. Suncast Corp.*, 237 F.3d 756, 762 (7th Cir. 2001) (citing 29 C.F.R. § 1630.2(j)).[6] Green has the burden of selecting which of his major life activities he will attempt to prove Pace regarded his IDC as substantially limiting. *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001). Specifically, because Plaintiff has identified Heelan as "the person who decided to fire Green" (D.E. 58 at 12, 14), Heelan therefore is the operative decisionmaker, and Green must demonstrate that Heelan regarded or perceived the IDC to substantially limit Green's proffered major life activities. *See Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152, 1163 (10th Cir. 2002); *Deas v. River West, L.P.*, 152 F.3d 471, 476 n.9 (5th Cir. 1998). In an attempt to meet this burden, Mr. Green contends that

---

[6]     The Seventh Circuit instructs that "[u]nder the ADA, the concepts of 'substantially limits' and 'major life activity' are the same whether the employee is proceeding under a claim that [the employee] is actually disabled or regarded as disabled." *Mack*, 308 F.3d at 781.

Pace believed that his IDC limited him in the following four major life activities: (1) breathing; (2) walking; (3) staying awake; and (4) driving. (D.E. 58 at 12.)

Mr. Green faces an uphill battle in this case, as there is a developed body of precedent in which dismissals of public transportation drivers were upheld against ADA claims in situations where the driver did not qualify for a DOT medical certification. For example, in *Bay v. Cassens Transport Co.*, 212 F.3d 969 (7th Cir. 2000), the plaintiff was a longtime truck driver who was diagnosed with, among other things, near syncope and near fainting. The defendant company thereafter referred plaintiff to a physician with whom it had an ongoing relationship to perform DOT physicals, and the physician determined that plaintiff did not qualify under the DOT safety rules. *See Bay*, 212 F.3d at 971-972. Eventually, after seeing two other physicians, plaintiff was able to get DOT clearance, but he sued under the ADA and alleged that the defendant had violated the statute when it refused to return him to work prior to the eventual DOT certification clearance. *Id.* at 972. The Seventh Circuit held that summary judgment was warranted in favor of the employer, holding that plaintiff's "failure to obtain DOT certification is fatal to his ADA claim." *Id.* at 974. The Seventh Circuit recognized that "'to become a 'qualified individual' under the ADA, . . . drivers must be DOT certified or be able to obtain DOT certification' by passing 'the requisite physical examination.'" *Id.* at 975 (quoting *Prado v. Cont'l Air. Trans. Co., Inc.*, 982 F. Supp. 1304, 1307 (N.D. Ill. 1997)). *Bay* followed in the wake of *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516 (1999), where the Supreme Court rejected the plaintiff's claim that the plaintiff's employer's refusal to employ him as a mechanic—because of the company's belief that he could not qualify for DOT certification—meant that the employer regarded the plaintiff as disabled with respect to the major life activity of "working." The

Supreme Court found that summary judgment was warranted against plaintiff, because the evidence showed that plaintiff "at most, [was] regarded as unable to perform only a particular job. This is insufficient, as a matter of law, to prove that [plaintiff] is regarded as substantially limited in the major life activity of working." *Murphy*, 527 U.S. at 525.

Not surprisingly, given the precedent in this area, plaintiffs asserting ADA claims relating to DOT driving certifications have not fared well in this district court. Thus, *Prado v. Continental Air Transport Co., Inc.*, 982 F. Supp. 1304, 1307-08 (N.D. Ill. 1997), rejected the plaintiff's claim that the defendant trucking company violated the ADA by relying on its physician's diagnosis that plaintiff did not qualify to drive under DOT certification criteria[7] because of the fact that the plaintiff's right leg was atrophied from childhood polio. *Prado* held that the company was entitled to rely on the physician's diagnosis, even if plaintiff believed it was wrong, under applicable federal regulations, at least until the plaintiff produced a diagnosis that he was certifiable under the DOT regime. *See Prado*, 982 F. Supp at 1307. *Prado* concluded that because the plaintiff "failed to obtain the required DOT certification, he was never qualified for the position of driver" and plaintiff could not "claim that he was unlawfully denied employment for a position which he was never qualified to perform." *Id.* at 1308; *accord Long v. Chicago Transit Auth.*, 979 F. Supp. 1214 (N.D. Ill. 1997) (dismissing suit of plaintiff who could not garner DOT certification because of physical disability, and who alleged that he

---

[7]     The company adopted the DOT criteria as a matter of company policy pursuant to 42 U.S.C. § 12111(8). *See Prado*, 982 F. Supp. at 1307. This is certainly permissible. *See, e.g., Bay*, 212 F.3d at 974 (employer was "required to refuse [plaintiff's] request to return to driving a commercial motor vehicle until he presented the proper certification); *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998) ("Nothing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers.").

was unlawfully denied consideration for position as a bus driver, on the ground that the plaintiff was not a "qualified individual" within the meaning of the ADA); *Jones v. Roadway Express, Inc.*, No. 01-6213, 2003 WL 76868, at *6 (N.D. Ill. Jan. 8, 2003) (dismissing ADA suit of driver who could not obtain DOT medical certification, and finding failure-to-accommodate allegation baseless, where plaintiff "never made a good faith request for a reasonable accommodation" but instead wanted the company, which had no other objection to plaintiff, to pressure physician to authorize the DOT clearance).

Not all of this precedent is directly applicable (although some certainly is), given the way that Green has framed his arguments. However, it is important, at a minimum, because it helps to explain why Green engages in some tortured arguments in an effort to wend through the extensive body of caselaw that has rejected similar claims.[8]

As stated, Green attempts to establish that there are triable questions concerning whether Pace through its decisionmaker believed that Green's IDC limited him in the four proposed major life activities of driving, staying awake, walking, and breathing. (D.E. 58 at 12.) The Court will address these in turn.

First, at least as the arguments are framed in the context of this case, there are legal deficiencies with the proposed "major life activities" of driving and staying awake. With respect

---

[8]     This comment is not intended as a criticism of Green or his counsel. To the contrary: Green's lead counsel, James T. Derico, Jr., appeared *pro bono* pursuant to a court appointment and carried out his assignment consistent with the finest traditions of the bar. To faithfully discharge his assignment, it appears that Mr. Derico went so far as to enlist the assistance of Foster Marshall, Jr., who did not appear in court but appears "of counsel" on the summary judgment papers. Mr. Marshall doubtless made valuable contributions to the exemplary *pro bono* effort. Despite the fine efforts of Mr. Derico and Mr. Marshall, however, the record in this case and applicable precedent warrant summary judgment against Mr. Green.

to the proposed major life activity of driving, the weight of authority concludes that driving is not considered a major life activity. *See, e.g., Felix v. N.Y. City Transit Auth.*, 324 F.3d 102, 106 (2d Cir. 2003) (driving is "not considered a major life activity"); *Chenoweth v. Hillsborough County*, 250 F.3d 1328, 1329-30 (11th Cir. 2001) (holding that driving is not a major life activity, and stating that "millions of Americans do not drive, millions are passengers to work, and the deprivation of being self-driven to work cannot be sensibly compared to inability to see or to learn [which are examples of recognized 'major life activities']"); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir.1998) (rejecting driving as a major life activity and stating that it "cannot reasonably be deemed major league"). To be sure, the view is not monolithic, particularly as to the issue of whether driving can be a major life issue where it affects other aspects of life beyond driving itself. *See, e.g., Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995) (factoring driving into a determination concerning major life activity of "taking care of oneself" along with several other factors such as vacuuming, washing dishes, and carrying groceries with impaired hand). The Seventh Circuit has not decided the issue. *See Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship*, 209 F.3d 678, 685 (7th Cir. 2000) ("Although the Second Circuit has concluded that driving is not the type of endeavor that may be characterized as a major life activity, *see Colwell*, 158 F.3d at 643, we need not reach that issue.").

After reviewing the authority cited above, and the specific manner in which Green has framed his argument, the Court finds that driving, in and of itself, is not an activity "of central importance to daily life" in the context of this case. *Toyota*, 534 U.S. at 197. To resolve this question, the Court need not and does not purport to decide whether or to what extent limitations

on an individual's ability to drive might factor into a ADA disability analysis under all circumstances. Here, Green does not contend that his inability to drive *a bus* limited his ability to care for himself, or seek medical care, or even limited his ability to work—the more natural argument, but one squarely foreclosed by precedent. *See Murphy*, 527 U.S. at 523 ("'The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'") (quoting 29 C.F.R. § 1630.2(j)(3)(i)); *see also Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir. 1998) (stating that "[i]f an insulin-dependent diabetic cannot be depended upon to drive a bus safely, he cannot complain [under the ADA] about being disqualified from working as a bus driver"). Green does not even contend that he was limited in his ability to drive a car under Illinois law. Instead, Green's argument that Pace believed that his heart condition disqualified him from being a DOT certified bus driver (D.E. 58 at 13), is an argument that Pace regarded Green as limited in his ability to work in a DOT-certified employment position. And that argument—that one's perceived inability to work in a particular job, because of inability to obtain DOT certification, is akin to being perceived as unable to engage in the major life activity of working—is squarely foreclosed by the precedent cited above.

Similarly, Green cites no legal authority for his contention that "staying awake" is a major life activity. This contention appears to be related solely to the notion that Mr. Green's heart condition could cause syncope (sudden blacking out), and also carried with it the risk of sudden death. (D.E. 58 at 13; Def.'s St. ¶ 12.) Again, though, in the context of this case, the claim that "staying awake" is a "major life activity" is (with no disrespect intended) a contrived description, because "staying awake" as Green frames the argument is merely a proxy for "not suddenly

14

passing out or dying." One would not normally think of "not experiencing sudden death" or "not experiencing sudden collapse" as a "major life activity" in any usual sense of the term.

Green has offered no authority in support of his "staying awake" formulation. The Court's research uncovered only one case, an unpublished Third Circuit opinion, *Katekovich v. Team Rent A Car of Pittsburgh*, 36 Fed. Appx. 688 (3d Cir. 2002) (unpublished opinion), that addresses a plaintiff's contention that staying awake is a major life activity under the ADA.[9] The Third Circuit held that staying awake cannot, by itself, "be considered a major life activity. Rather, the difficulty or inability to stay awake during the day can only amount to a disability if it causes an impairment of some other life activity . . . ." *Katekovich*, 36 Fed. Appx. at 690. Although *Katekovich* is not precedential *per se*, the Court finds its approach to be a sensible one—at least in the context of the argument as framed by Green. Green does not contend that his risk of passing out and suddenly dying impaired any actual aspect of his life other than its negative impact concerning DOT certification. Precedent does not recognize that claim.[10]

Green further contends that Pace regarded his IDC as limiting his major life activities of breathing and walking. These are recognized major life activities. However, as to these major life activities (and as to "driving" and "staying awake" too, if one assumes *arguendo* that they

---

[9] Even within the Third Circuit, unpublished opinions of that Court of Appeals are not binding. *See* Third Circuit Internal Operation Procedures Ch. 5.7. Although not binding, the Third Circuit does permit citation of its unpublished opinions for the persuasiveness of their reasoning. *See Aetna Life & Cas. Corp. v. Maravich*, 824 F.2d 266, 269 (3d Cir. 1987).

[10] One can readily posit situations where the "staying awake" contention might be framed differently, and a different determination concerning "major life activity" status might obtain. For example, if someone suffered from narcolepsy to such an extent that they could not work at all, their arguments concerning "major life activity" might obtain a different result. The Court need not speculate, however, as Green's argument is framed differently.

actually qualify as "major life activities" as framed by Green), summary judgment is still warranted on factual grounds. Simply put, Green identifies no evidence to create a triable issue as to whether Pace (though its decisionmaker) actually regarded him as disabled concerning his identified life activities of walking, breathing, etc.

In fact, despite the best efforts of Plaintiff's *pro bono* counsel, it is not even clear whether the relevant Pace decisionmaker(s)[11] had any meaningful knowledge even that Plaintiff had any specific medical condition or symptoms—i.e., "syncope," "dyspnea," or "idiopathic dilated cardiomyopathy." As one would naturally expect, what the evidence (including, in particular, the evidence offered by Plaintiff) reflects is that the decisionmakers (who are not medical professionals, but rather are busy laypeople who are responsible for overseeing a public transportation operation) knew that Green had to "see his cardiologist to clear him for work based on DOT regulation." (D.E. 59, Pl.'s Ex. 12 at 2 (cited by Plaintiff, D.E. 58 at 7)). Likewise, Cutler (the proposed conduit of information to the decisionmakers), testified that he did not discuss Green's specific medical condition with anyone. (*Id.*, Pl.'s Ex. 36 at 109 (cited by Plaintiff, D.E. 58 at 12); *see also id.*, Pl.'s Ex. 32 at 15 (cited by Plaintiff, D.E. 58 at 8) (Heelan testifying that Cutler told him that "Dr. Estrella, had reviewed documentation from Arthur's [Green's] doctor and that he was medically unqualified"); *id.*, Pl.'s Ex. 34 at 6 (Fardoux testifying that Cutler told him that Green was "medically disqualified . . . from work" based on the assessments of Green's own doctor and Dr. Estrella).) There is no indication at all—again,

---

[11]     Although Plaintiff has indicated that he believes Heelan was the relevant decisionmaker (D.E. 58 at 12, 14), at least some other snippets of the record suggest that Fardoux also may have been a decisionmaker. The Court has analyzed whether there is a triable issue regarding whether either Heelan or Fardoux regarded Plaintiff as disabled with respect to any of the proffered major life activities, and there is no such triable issue.

consistent with common experience—that these public transportation specialists were focused on the nuances of cardiac medicine, rather than being concerned with the bottom-line consideration that Plaintiff simply could not get the appropriate licensing or certification to drive a public transportation vehicle.[12]

Even more relevant, to the extent that Plaintiff can show that the decisionmakers had at least potential exposure to the specifics of the medical diagnoses (*see, e.g.*, D.E. 59, Pl.'s Ex. 17 (medical form from Dr. Estrella to Cutler, that was forwarded to supervisors, stating that Green was "unable to perform his duties safely at this time. Await clearance by PMD re: dilated cardiomyopathy") (cited by Plaintiff at D.E. 58 at 7)) Plaintiff identifies no evidence whatsoever that this exposure to any medical terms led the decisionmakers to come to any assessments concerning whether Plaintiff was disabled as to any of the major life activities that Plaintiff proposes. Precedent teaches that even if Pace was aware of Green's IDC or any related condition such as dyspnea, mere awareness of a potential medical condition does not, standing alone, support an inference that Pace regarded Green as substantially limited in any of his proposed major life activities. *See Skorup*, 153 F.3d at 515; *accord, e.g., Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996) (holding that the fact "that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as

---

[12]     Plaintiff appears at times to question whether the physicians in this case (including, most notably, his own doctors) were correct when they diagnosed him and refused to give him DOT certification prior to his Pace termination. Precedent teaches, however, that an employer is entitled to rely on medical determinations made by medical professionals, including, of course, the plaintiff's own physicians. *See, e.g., Bay*, 212 F.3d at 974 (collecting cases); *see also Murphy*, 527 U.S. at 522 ("Had a physician examined petitioner and, in light of his medical history, declined to issue a temporary DOT certification, we would not second-guess that decision.").

17

disabled or that that perception caused the adverse employment action"); *Davis v. Tammac Corp.*, 127 F. Supp. 2d 625, 631 (M.D. Pa. 2000) (holding that awareness of an employee's heart condition is not sufficient to establish that the employee was regarded as disabled).

In this regard, it is worth noting that Plaintiff cites no instance where he even asked any of the Pace decisionmakers during discovery whether they regarded Green as disabled with respect to, for example, the proposed major life activity of walking. And such an inference, in the absence of any evidence, makes no sense in the context of this case. As Green points out, "as [a] Pace employee, Green had no problems performing his job," and he never experienced any problems at work—other than not obtaining his DOT certification. (Pl.'s St. ¶ 3.) Two weeks after being fired by Pace, Green obtained another job where he lifted and mopped and shampooed, and he was also was able to walk and to run. (Def.'s St. ¶¶ 67-71.) Green is not able to forestall summary judgment by requesting speculation or conjecture, much less speculation contrary to the other evidence in the record in the case. *See, e.g., Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.") (citing *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)). At bottom, the record reveals that Pace decisionmakers "did not regard [Plaintiff] as disabled, only that he was not certifiable under DOT regulations." *Murphy*, 527 U.S. at 520 (internal quotation omitted).

Before concluding this area of analysis, a response is warranted to two additional arguments that Plaintiff offers. First, Green contends that Pace knew, through Dr. Barron, Green's personal physician, that Green's IDC was an "NYHA Class III" condition. (D.E. 58 at 12.) (Dr. Barron in turn testified that at the time Green was an NYHA class III, Green "would

have problems. He could not do his household chores. . . . [H]e would be severely limited."
(D.E. 59, Pl.'s Ex. 35 (Barron Dep.) at 18).) This evidence is not relevant, however, because
there is no evidence—contrary to Plaintiff's invitation to engage in a series of inferences and
speculations—that this diagnosis was communicated to anyone at Pace, much less a Pace
decisionmaker. If there were evidence of such communications, Green should have presented it
at this stage of the litigation. Instead, all that the record allowed Green to do was invite the
speculation that the information reached the Pace decisionmaker(s). Precedent teaches that such
speculation is not permissible. *See Bell*, 367 F.3d at 707; *McCoy*, 341 F.3d at 604.[13]

Second, Green suggests that Dr. Estrella of St. Francis Hospital, who worked for Pace
from time to time and consulted in this case, should be deemed an "agent" of Pace. Although
Pace vigorously disputes the notion that Dr. Estrella was its "agent," even if one assumes that he
is, Green gets no help from Dr. Estrella. The issue is not whether *any* person associated with
Pace may have held known certain facts (e.g., the possible implications of certain medical
conditions), but whether a relevant Pace decisionmaker regarded Green as disabled. As
explained above, there is no triable issue of fact on that score. (*See also* D.E. 59, Pl.'s Ex. 32
(Heelan Dep.) at 18 (Heelan never spoke with Dr. Estrella or any other doctor); *id*, Pl.'s Ex. 33

---

[13]      Green also contends that "[b]ecause Pace was aware of [Green's] NYHA classification,
Pace was correspondingly aware of [Green's] dyspnea (shortness of breath) . . . and the like."
(D.E. 58 at 13.) In support of this argument, Green cites—and only cites—paragraph seven of
Pace's LR 56.1 statement. Green has provided no evidence that anyone at Pace was aware of the
NYHA classification at the time of his termination. In addition, while it is true that paragraph
seven of Pace's LR 56.1 Statement states that Green suffered from, among other things, dyspnea,
Pace supports this assertion with the deposition testimony of Drs. Barron and
Katsamakis—Green's own doctors—and an interrogatory response provided by Green. Thus,
Green's reliance on this paragraph as support for his assertion is misplaced because it sheds no
light on Pace's knowledge or beliefs at the time of Green's termination.

(Fardoux Dep.) at 22-23 (Fardoux never spoke with Dr. Estrella); *id.*, Pl.'s Ex. 29 (Estrella Dep.) at 32 (Dr. Estrella never spoke with anyone regarding whether Pace should fire Green, and Dr. Estrella did not even know Green was fired until receiving a subpoena in this litigation).)

B.    Mr. Green Is Not A Qualified Individual Under The ADA

Mr. Green's suit also is subject to summary judgment because the record makes clear that he cannot satisfy his burden of showing that he was a qualified individual within the meaning of the ADA. Summary judgment is independently warranted on this alternative ground.

Assuming, *arguendo*, that Mr. Green could establish that Pace regarded him as disabled, he still bears the additional burden of showing that he was a qualified individual for purposes of the ADA. *See Dyke v. O'Neal Steel, Inc.*, 327 F.3d 628, 632 (7th Cir. 2003). "The ADA proscribes discrimination against only 'qualified individual[s] with a disability.'" *Bombard*, 92 F.3d at 563 (quoting 42 U.S.C. § 12112(a)). A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *accord Ammons*, 368 F.3d at 818. The determination as to whether the individual is a "qualified individual with a disability" must be made as of the time of the adverse employment decision. *See, e.g., Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir.1996). As set forth below, Green's ADA claim fails for the alternative and independent reason that he cannot meet this burden.

The Seventh Circuit employs a two-step analysis to determine if an individual with a disability is qualified for a particular job. *See Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001); *Bombard*, 92 F.3d at 563 (citing 29 C.F.R. app. § 1630.2(m)). Specifically, the Seventh

20

Circuit instructs that a court should first consider whether the individual "satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Bay*, 212 at 974 (citing 29 C.F.R. app. § 1630.2(m)). A plaintiff's failure to satisfy step one of the two-part analysis requires a grant of summary judgment in favor of the defendant. *See, e.g., Weiler*, 101 F.3d at 524; *Prado*, 982 F. Supp. at 1306. If the individual satisfies step one, a court then considers step two, whether the individual can perform the essential functions of the position with or without reasonable accommodation. *See, e.g., Bay*, 212 F.3d at 974 (citing 29 C.F.R. app. § 1630.2(m)). As an aside, the Court notes that, given the facts of this case, it is unclear whether DOT certification is properly analyzed under the first or second step of the analysis set forth above. In any event, the parties are in agreement that DOT certification is an essential function of a Pace bus driver's job. (Pl.'s St. ¶ 23.) The Court therefore proceeds to the second step, as it is dispositive, although the Court finds it strained to consider a threshold requirement like DOT certification as a "function" of a job. *See* 29 C.F.R. § 1630.2(n)(1) (defining "essential functions" as "the fundamental job duties of the employment position").

The Seventh Circuit and courts within this district have held, in cases involving other ADA plaintiffs who failed to obtain DOT certification, that an individual is not a qualified individual under the ADA if he or she cannot obtain DOT certification for a job that requires such certification. *See, e.g., Bay*, 212 F.3d at 974-75; *Jones*, 2003 WL 76868, at *6; *Prado*, 982 F. Supp. at 1308; *Long*, 979 F. Supp. at 1217-18. The Court need not decide whether the reasoning of these cases directly applies to Green's case, however, because he has effectively conceded that he could not perform an essential function of his part-time bus driver job (DOT

21

certification), and he seeks to establish his qualified status by arguing that he could perform this essential function if Pace granted him a reasonable accommodation. *See* 42 U.S.C. § 12111(8).

Plaintiff's desire to proceed to the reasonable accommodation issue is prudent, given that: Green acknowledges that DOT certification is an essential function of a Pace bus driver's job (Def.'s St. ¶ 23); Green's own doctor would not certify him under the DOT regulations (*id.* ¶ 46); and Pace has no discretion to allow an employee who has not obtained DOT medical clearance to drive a bus (*id.* ¶ 24). The issue then, which is intertwined with a previous ruling by Judge Amy St. Eve in this case, is whether Mr. Green can meet his burden of establishing that he can perform the essential function of his job (whether it is properly viewed as DOT certification or driving) with a reasonable accommodation.

As a threshold matter, there is substantial authority that holds that Plaintiff's "reasonable accommodation" claim fails at the outset as a matter of law because Plaintiff only claims that he was "regarded as" disabled by the Defendant as opposed to being actually disabled. In *Weber v. Strippit, Inc.*, 186 F.3d 907, 917 (8th Cir. 1999), for example, the Eighth Circuit held "that 'regarded as' disabled plaintiffs are not entitled to reasonable accommodations" because "[t]he ADA cannot reasonably have been intended to create a disparity in treatment among impaired but non-disabled employees, denying most the right to reasonable accommodations but granting to others, because of their employers' misperceptions, a right to reasonable accommodations no more limited than those afforded actually disabled employees." At least two other circuit courts have held to the same effect, *see Kaplan v. City of North Las Vegas*, 323 F.3d 1226, 1232 (9th Cir. 2003), *Newberry v. East Texas State Univ.*, 161 F.3d 276, 280 (5th Cir. 1998), and the Sixth Circuit has reached the same conclusion, albeit likely only in dicta. *See Workman v. Frito-Lay,*

*Inc.*, 165 F.3d 460, 467 (6th Cir. 1999). Two district courts in this circuit have also held that no duty of accommodation exists where an ADA plaintiff is not actually disabled but only claims he is "regarded as" disabled. *See Cebertowicz v. Motorola, Inc.*, 178 F. Supp. 2d 949, 953-54 & n.8 (N.D. Ill. 2001) (Shadur, J.); *Ross v. Matthews Employment*, No. 00-1420, 2000 WL 1644584, at *5 (N.D. Ill. Oct. 27, 2000) (Conlon, J.).

Despite this weight of authority, at least one circuit court has reached the opposite conclusion. *See Katz v. City Metal Co.*, 87 F.3d 26, 33-34 (1st Cir. 1996). And the extended analysis of the issue in *Jacques v. DiMarzio, Inc.*, 200 F. Supp. 2d 151, 163-171 (E.D.N.Y. 2002) (Block, J.), which held that "regarded as" plaintiffs were not precluded from accommodation protections, shows, at a minimum, that the question is one on which reasonable people can disagree.

The Court need not weigh into this debate. As explained below, even if Green can potentially qualify for accommodation obligations, the record in the case shows that Green's case again should be dismissed for the alternative and independent reason that he cannot establish a successful accommodation claim.

       1.     Judge St. Eve's January 29 Order

The analysis of the accommodation question is substantially influenced by an order of Judge St. Eve issued before the case was reassigned to this Court. On January 29, 2004, Judge St. Eve denied Plaintiff's motion for leave to amend his complaint to add a failure to accommodate claim. Judge St. Eve held that Green's failure to accommodate claim was futile because it would not survive a motion to dismiss. In this regard, Judge St. Eve found that the proposed failure-to-accommodate claim was beyond the scope of Green's EEOC charge and that

Green did not request any accommodation. Judge St. Eve's accommodation findings are relevant because, as explained above, Green now, in an effort to satisfy his burden of demonstrating that he is a qualified individual under the ADA, argues that he could have performed the essential functions of his part-time bus-driver job with an accommodation.

Pace responds that such an argument is "a blatant attempt to circumvent Judge St. Eve's" order (D.E. 64 at 5), and Pace requests this Court to strike those portions of Green's summary judgment filings relating to the alleged failure to accommodate.[14] Green, apparently anticipating such a response, offered a preemptive threefold rebuttal in his brief in opposition, as discussed below.

First, Green argues that Judge St. Eve simply denied "Plaintiff's Motion to Amend and did not preclude his pursuit of a 'failure to accommodate' as part of his overall ADA claim." (D.E. 58 at 19.) This argument is without foundation. Judge St. Eve denied Green's motion to amend on futility grounds—in that it could not survive a motion to dismiss—which precludes Plaintiff from advancing an independent failure to accommodate claim.

Second, Green argues that even if Judge St. Eve did rule that Green cannot pursue a failure to accommodate claim, "Judge St. Eve was wrong[,] and [Plaintiff] . . . invites the Court to correct the error." (*Id.* at 19-20.) In evaluating Green's invitation to overturn Judge St. Eve's prior order, the Court notes that Plaintiff's request implicates a "variant of the law of the case doctrine that relates to the re-examination of a prior ruling by a different member of the same court." *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997). The Seventh Circuit has

---

[14] Pace's Reply Memorandum in Support of its Motion for Summary Judgment is cited to by its docket entry number, D.E. 64.

instructed that "the presumption [in such cases] is that earlier rulings will stand" and that prior rulings should be disturbed only "for compelling reasons (such as new controlling law or clear error)." *Id.* The "doctrine in these circumstances reflects the rightful expectation of litigants that a change of judges mid-way through a case will not mean going back to square one." *Id.* With the Seventh Circuit's teaching in mind, the Court turns to Plaintiff's request to reverse.

The Court is not persuaded that Judge St. Eve's order was erroneous, much less clearly so. Judge St. Eve based her holding on the Seventh Circuit's decision in *Green v. National Steel Corp., Midwest Division*, 197 F.3d 894 (7th Cir. 1999).[15] *National Steel* noted that the Seventh Circuit "has held that a plaintiff is barred from raising a claim in the district court that had not been raised in his or her EEOC charge unless the claim is reasonably related to one of the EEOC charges and can be expected to develop from an investigation into the charges actually raised." *Nat'l Steel*, 197 F.3d at 898 (citing *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). *National Steel* stated that "a failure to accommodate claim is separate and distinct from a claim of discriminatory treatment under the ADA," *id.*, and further stated that a failure to accommodate claim and a discriminatory treatment claim under the ADA "are not like or reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability." *Id.*

Mr. Green contends that a failure to accommodate claim is within the scope of his EEOC charge. (D.E. 58 at 20.) In Mr. Green's EEOC charge, he stated:

---

[15]  *Green v. National Steel* is referred to as *National Steel* throughout this opinion, to avoid any confusion with the Plaintiff, Mr. Green.

> I am a part-time Bus Operator and began my employment with Respondent on
> February 26, 2001. On June 25, 2001[,] I became ill and was subsequently
> diagnosed with a disability. On July 18, 2001[,] my doctor released me to return
> to work on my former part-time schedule. Respondent refused to put me back to
> work and said I could not return for six months. I believe I was discriminated
> against because of my disability in violation of Title I of the Americans with
> Disabilities Act of 1990.

(D.E. 59, Pl.'s Ex. 23 (Charge of Discrimination).) In his summary judgment response, Green

does not appear to argue that the text of Green's EEOC charge includes a failure to accommodate

claim, and it clearly does not. Rather, Mr. Green argues that he checked off "the box for

'disability' [on the EEOC charge] and, consequently, any matter that is reasonably related to

same that could have reasonably developed from same is actionable in this litigation." (D.E. 58

at 21.) The Court respectfully disagrees. This contention, without more, is in direct conflict with

the Seventh Circuit precedent, which precedent Judge St. Eve relied on in her January 29 order.

Indeed, as noted above, in *National Steel*, the Seventh Circuit held that a failure to accommodate

claim and a discriminatory treatment claim under the ADA "are not like or reasonably related to

one another, and one cannot expect a failure to accommodate claim to develop from an

investigation into a claim that an employee was terminated because of a disability." *See Nat'l

Steel*, 197 F.3d at 898; *accord Brown v. Carrier Corp.*, No. 02-316, 2003 WL 22016372, at *6

(S.D. Ind. Aug. 19, 2003); *Shannon v. Sheahan*, No. 01-252, 2003 WL 366584, at *10 (N.D. Ill.

Feb. 18, 2003). Notwithstanding that Judge St. Eve expressly relied on *National Steel* in her

order, Green has not even suggested a basis for distinguishing the case and Plaintiff simply

ignores *National Steel* in his summary judgment brief. Given Judge St. Eve's reliance on the

Seventh Circuit's teaching in *National Steel* and Plaintiff's failure even to address it, the Court

cannot say Judge St. Eve's order is clearly erroneous.

Green also contends that the EEOC actually investigated his failure to accommodate claim. In support, Green cites an EEOC investigators's notes. Those notes, however, do not raise a triable issue that would warrant disturbing Judge St. Eve's order. The EEOC notes simply read that Green "stated that he did not ask for any accommodation other than to be returned to his position. He also stated that he does not believe that he is qualified for any other position because all of the positions require driving." (D.E. 59, Pl.'s Ex. 23 (EEOC notes dated Jan. 29, 2002).) The notes do not indicate that the EEOC believed a failure to accommodate claim existed or pursued any investigation into such a claim. Judge St. Eve was aware of these notes, as she, in fact, quoted them in support of her ruling that Mr. Green's failure to accommodate claim was beyond the scope of Green's EEOC charge. Similarly, the fact that Pace's position statement that Pace filed with the EEOC discusses in boilerplate fashion whether accommodation duties exist under, for example, Illinois law, sheds no light on whether the EEOC actually investigated any purported failure to accommodate claim advanced by Green.

As the final basis for attacking Judge St. Eve's order, Green argues that even if Judge St. Eve's order correctly precluded the addition of a failure-to-accommodate claim, the accommodation issue is still material because Green should be permitted to show that he was qualified to perform the essential functions of his bus driver job "with an accommodation." (D.E. 58 at 22.) This, Green contends, requires an analysis of whether Pace failed to accommodate him, notwithstanding that Green failed to raise any failure to accommodate count in this Court. (*Id.*) Even if Green is correct on his legal argument that accommodation issues are still in the case (Pace vigorously disputes this, although it does not cite any precedent addressing the issue), Green nonetheless cannot prevail on the accommodation front.

27

First, in reviewing the evidence in this case, it appears that Green never made even the most minimal request for accommodation so as to trigger Pace's responsibility to engage in a dialogue and interactive process to see if accommodation can be achieved. *See, e.g., Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000) (collecting cases and stating "[w]hen . . . the disabled worker has . . . asked for an accommodation so that he can continue working, the employer has the burden of exploring with the worker the possibility of a reasonable accommodation"). Understandably, precedent teaches that the employee's request can be informal. *See Miller v. Ill. Dep't of Corr.*, 107 F.3d 483, 487 (7th Cir. 1997) ("Even if an employee . . . just says to the employer, 'I want to keep working for you–do you have any suggestions?' the employer has a duty under the Act to ascertain whether he has some job that the employee might be able to fill."). Precedent also teaches, however, that where the employee simply demands to be kept in a position for which he is not qualified, or requests the functional equivalent of retention in a position for which the employee is not qualified, that does not suffice to trigger the employer's responsibility regarding accommodation. As *Miller*, a case involving a correctional officer who regrettably was afflicted with a serious vision impairment, stated:

> [Plaintiff] wanted to remain at [the prison] on her own terms, and those terms involved her remaining, with or without the uniform, in the same job status that she had occupied before she became disabled. That is the job status that she is *not* qualified for under the disability law because she cannot perform its essential duties. She evinced no interest in prison jobs not occupied by correctional officers, jobs the essential duties of which may be within her ability to perform. She thus did not put the prison on notice to search out such jobs in order to determine whether there was one she might fill.

*Id.* at 487 (emphasis in original).

Green cites to a portion of Judge St. Eve's prior order in which she stated that "Plaintiff

does not dispute . . . [that] he 'did not ask for any accommodation other than to be returned to his position.'" (D.E. 58 at 20 (quoting Judge St. Eve's Jan. 29 Order).) Green contends that "[w]hile it may be odd to ask for the 'accommodation' of being returned to one's job, it is . . . [nonetheless] a request for an accommodation." (*Id.* at 21.) Despite *pro bono* counsel's diligent efforts to create an accommodation request for Plaintiff, however, it appears clear that under *Miller*, Plaintiff's request to be returned to the driving role for which he was not certified is not a request for accommodation at all. It is, instead, a request to be placed in the job in contravention of company policy (which in turn is based on DOT safety regulations), without any waiver of the DOT certification requirement. Not surprisingly, the law does not require such a step. *See, e.g., Gile*, 95 F.3d at 499 ("The ADA may only require an employer to reassign a disabled employee to a position for which the employee is otherwise qualified."). Green also cites a portion of his deposition testimony where he alleges that Green asked Cutler, his immediate supervisor, to drive vans for Pace instead of his existing duties driving buses and shuttle buses for Pace. (D.E. 58 at 19.) Whatever engineering distinction, if any, might exist be between a "van" and a "shuttle bus," the salient issue here is that it is undisputed that a van driver position required the same DOT certification that Plaintiff was unable to obtain. *Miller* teaches that where an employee has asked for the functional equivalent of the position for which she is unqualified, that does not put the employer "on notice to search out such [other] jobs in order to determine whether there was one that she might fill." *Miller*, 107 F.3d at 487. In *Miller*, the employee stated that she "would even be willing to take the officer's uniform off," and would take "a position within the facility that would be appropriate for my professional experience and background," and the Court found that in effect Plaintiff wanted to remain "a correctional officer

29

without having to perform the full range of duties for the job." *Id.* at 486. Here, Plaintiff's alleged request to remain a driver (of "vans" as opposed to "buses") was a request to be assigned to a position in which he could not perform the central duty of the job—driving the passenger vehicle in question. That request does not trigger a duty to accommodate. *See Miller*, 107 F.3d at 487 ("She evinced no interest in prison jobs not occupied by correctional officers, jobs the essential duties of which may be within her ability to perform.").

Even if the Court is wrong about all of the foregoing—such that Judge St. Eve was in error or Plaintiff otherwise legitimately triggered accommodation duties—and even if the Seventh Circuit would not side with the majority of courts holding that there is no a legal duty to accommodate in an "as regarded" plaintiff, the accommodation issue still would not preclude summary judgment against Green. This is the case because the record makes clear that the jobs and steps Green has identified in this litigation as possible alternatives were not available or were not legally required at the relevant time.

In this regard, Green contends that he should have been given the chance to go on unpaid leave.[16] Green argues (with the benefit of hindsight) that, with sufficient time off, he would have eventually become DOT certified and resumed his job as a part-time bus driver. (D.E. 58. at 16.) The ADA, however, generally contemplates accommodations that allow a person to perform the essential functions of the position, *see Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003), and the determination as to whether the individual is a qualified individual with a disability must be made as of the time of the adverse employment decision. *See, e.g., Weiler*, 101

---

[16]    Green does not discuss whether such unpaid leave would have included benefits such as health insurance.

F.3d at 524. The Seventh Circuit has instructed that "[n]ot working is not a means to perform the job's essential functions," *Byrne*, 328 F.3d at 381, and the "[i]nability to work for a multi-month period removes a person from the class protected by the ADA." *Id.* An unpaid leave of absence (for a period of at least six months, given the physician's determination in this case) for Green was not required by the ADA. As a probationary Pace employee, Green also was not entitled to unpaid leave (D.E. 59, Pl.'s Ex. 34 (Fardoux Dep.) at 26), and precedent teaches that "the ADA does not require creation of extended leave status to accommodate disabled employees." *Pond v. Michelin N. Am., Inc.*, 183 F.3d 592, 597 n.5 (7th Cir. 1999) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173 (6th Cir. 1996)). For all of these reasons, Green's contention that he was qualified individual with the accommodation of an unpaid leave of absence is unavailing.

Green also argues that he was qualified individual with the accommodation of being transferred to a vacant position. A reasonable accommodation under the ADA may include reassigning an employee to a vacant position where the employee can no longer perform the essential functions of his or her job. *See* 42 U.S.C. § 12111(9)(B); *Gile*, 95 F.3d at 498. The Seventh Circuit has felt it "prudent to emphasize" that there are meaningful "limitations on an employer's potential obligation to reassign a disabled employee." *Gile*, 95 F.3d at 499. In this regard, the ADA may only require that an employer assign an employee to a position for which the employee is otherwise qualified. *See id.* An employer is not required to change the essential functions of any vacant positions to accommodate an employee. *See Ozlowski v. Henderson*, 237 F.3d 837, 841 (7th Cir. 2001) (collecting cases). An employer does not have to create any positions for the employee, and the employer does not have to "bump" its current employees to create vacant positions. *See Hansen*, 233 F.3d at 523; *Gile*, 95 F.3d at 499. Moreover,

"[n]othing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers." *Dalton*, 141 F.3d at 678. And an employer need not fill a "vacant" job slot that it otherwise had chosen not to fill based on a reason independent of the employee's disability. *See Ozlowski*, 237 F.3d at 841.

Green states that he bears the burden of showing both that a vacant position exists and that he is qualified for that position. (D.E. 58 at 16.) Green suggests three positions that were available: (1) folder; (2) cleaner; and (3) building maintenance person. (*Id.*) In support, Green relies on Plaintiff's Exhibit 26, which lists, among other things, jobs that were vacant at Pace on both August 16, 2001, and August 31, 2001. (Pace terminated Green on August 25, 2001.) None of these positions, however (as demonstrated by Green's own documents), were available at Pace's North Shore Division, for which Green was employed. Instead, the only positions that were vacant at the time of Plaintiff's termination at North Shore were positions of mechanic and bus operator, and both of those positions required a DOT medical certification. (D.E. 59, Pl.'s Ex. 26; *id.*, Ex. 32 (Heelan Dep.) at 38-41.)

With regard to the proposed positions outside of the North Shore Division (that is, the three positions Plaintiff actually identifies), it bears mention that the record establishes that the various divisions of Pace were responsible for hiring and firing their own employees, and each division effectively was its own employment center—complete with its own union/management structure. (D.E. 59, Pl.'s Ex. 31 (Roglich Dep.) at 34-35.)[17] If a vacancy existed in another

---

[17]    Green acknowledges that Pace considers each of the separate divisions to be separate employers. (D.E. 58 at 2 n.1.)

division, Pace had no policy which granted an existing employee any preference in applying to another division, and it was Pace's policy to give the most qualified applicant preference for a vacancy, regardless of whether the person worked somewhere for Pace or not.[18] (*Id.*) Any applicant would need to take the requisite medical examinations, meet other qualifications for the job, and if an existing Pace employee were hired by another division, that employee would effectively need to terminate his employment with the old division and be hired by the new division. (*Id.* at 35-36.) The non-preference for Pace employees concerning intra-corporate moves weighs heavily against any successful accommodation claim, because precedent teaches that "[n]othing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications . . . and intra-company transfers." *Dalton,*141 F.3d at 678. Plaintiff has not shown that he is entitled to an intra-corporate transfer as an ordinary employee of the North Shore Division, and *Dalton* teaches that Plaintiff's status as an (assumed) "as regarded" ADA plaintiff cannot create a duty on Pace to change its rules just for him. *See also E.E.O.C. v. Humiston-Keeling, Inc.*, 54 F. Supp. 2d 798, 817 (N.D. Ill. 1999) ("[T]he ADA does not mandate preferential treatment when reassigning an employee who can no longer perform her position."), *aff'd,* 227 F.3d 1024 (7th Cir. 2000).

Finally, even if Pace were required to give Green a preferential look for an intra-corporate

---

[18]     Plaintiff proposes that "internal" job candidates were given preference over "external" candidates (D.E. 58 at 10); however, the record material Plaintiff offers in support of this contention (namely, deposition testimony of William Heelan) does not create a disputed material fact on this issue. In his deposition, Heelan twice stated that questions concerning transfers are questions for Pace's Human Resource Department. (D.E. 59, Pl.'s Ex. 32 (Heelan Dep.) at 11.) The testimony of Pace's Human Resource Manager, Marion Roglich, establishes in clear terms that there was no preference at Pace for applicants seeking a job in another division. (*Id.*, Pl.'s Ex. 31 (Roglich Dep.) at 36-37.)

transfer to one of the three positions he identifies, Green still would come up short. The positions of building maintenance person and cleaner both required DOT medical certification—which Plaintiff conceded his doctors would not give him. *See, e.g., Humiston-Keeling,* 227 F.3d at 1028 ("[E]mployer is not required 'to reassign a disabled employee to a position when such a transfer would violate a legitimate, nondiscriminatory policy of the employer.'"); *Dalton,* 141 F.3d at 678. Moreover, the position of "folder" was only "technically vacant" when Green was terminated. (D.E. 59, Pl.'s Ex. 31 (Roglich Dep.) at 38).) At the time Plaintiff was fired, the position was being filled by use of a temporary employee through September 2001 because of budgetary constraints and a corresponding job freeze for lower level positions. (*Id.* 38-39.) After September 2001, the funding for the position ran out entirely and it was not filled with a permanent employee until September of 2002. (*Id.* at 39.) As a result, when Plaintiff was fired in August of 2001, the position was not a viable transfer accommodation because of the hiring freeze and use of the temporary worker to fill the slot. (*Id.* at 40-42.) Precedent makes clear that Pace is not required by the ADA to put Plaintiff into an otherwise unavailable position as an accommodation. *See, e.g., Ozlowski,* 237 F.3d at 841 (employer need not fill vacant slot if it decided to keep position unfilled for reasons unrelated to plaintiff's disability); *Hansen,* 233 F.3d at 523 (employer need not terminate an existing employee to accommodate an ADA plaintiff); *Pond,* 183 F.3d at 596 (employer need not "bump" an existing employee, even one with less seniority, to accommodate an ADA plaintiff).

C.    Given The Independent And Alternative Bases For Summary Judgment, The Court Need Not Analyze The Pretext Issue

Defendant argues that it is alternatively entitled to summary judgment on the basis that the record dictates the conclusion that Pace's reason for terminating him was not a pretext for disability discrimination. The Court need not address this argument. As explained above, there are multiple, independent reasons why Plaintiff's claim fails and why summary judgment is warranted. Despite the fine *pro bono* efforts of Plaintiff's counsel, the record reveals that Pace did not engage in unlawful discrimination when it refused to allow him to work in a position and thereby terminated him from a job for which he could not be medically certified under DOT regulations and corporate policy.

## CONCLUSION

For the foregoing reasons, Pace's Motion for Summary Judgment is granted and its Motion to Strike is denied as moot.

So ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Dated: ____JUL 9 - 2004____

35